# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00780-CV

---

### M. Y., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE COUNTY COURT AT LAW OF BASTROP COUNTY
### NO. 21-20726, THE HONORABLE BENTON ESKEW, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

M.Y. (Mother) appeals the trial court's order terminating her parental rights to her three-year-old daughter, E.Y.[1]  In five issues, Mother asserts that the evidence is legally and factually insufficient to support the trial court's findings that statutory grounds for termination exist, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P), and that termination of her parental rights is in E.Y.'s best interest, *see id.* § 161.001(b)(2).[2]  For the reasons that follow, we affirm the trial court's order of termination.

---

[1] For the child's privacy, we refer to her and her mother by their initials and by their relationships to each other, and we refer to the child's approximate age at the time of trial.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

[2] The order also terminated the parental rights of E.Y.'s father, who did not file a notice of appeal and therefore is not a party to these proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

In April 2021, the Texas Department of Family and Protective Services received a report of neglectful supervision of E.Y. while in Mother's care. Specifically, the report alleged that Mother was using methamphetamine and that the child was unclean, suffering from a diaper rash, and had no clean clothes or shoes.

Following an investigation, the Department sought and obtained temporary managing conservatorship of E.Y. and filed its petition seeking termination of Mother's parental rights. The case proceeded to a bench trial in November 2022. At the conclusion of the trial, the trial court found by clear and convincing evidence that Mother had (1) knowingly placed or knowingly allowed E.Y. to remain in conditions and surroundings which endangered her physical and emotional well-being; (2) engaged in conduct or knowingly placed E.Y. with persons who engaged in conduct which endangered her physical and emotional well-being; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of E.Y.; and (4) used a controlled substance in a manner that endangered the health or safety of the child and failed to complete a court-ordered substance abuse treatment program. *See id.* § 161.001(b)(1)(D), (E), (O), (P). The trial court also found by clear and convincing evidence that termination of Mother's parental rights was in E.Y.'s best interest. *See id.* § 161.001(b)(2). This appeal followed.

**STANDARD OF REVIEW**

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). To terminate a parent-child relationship, the Department must prove by

clear and convincing evidence that (1) the parent's acts or omissions constitute at least one of the enumerated statutory grounds for termination, and (2) it is in the child's best interest to terminate the parent's rights. Tex. Fam. Code § 161.001(b)(1), (2). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630. In an appeal from an order terminating parental rights, we apply a standard of review that reflects this heightened standard of proof. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

In this context, "[t]he distinction between legal and factual sufficiency lies in the 2extent to which disputed evidence contrary to the finding may be considered." *In re A.C.*, 560 S.W.3d at 631. When evaluating the legal sufficiency of the evidence, we cannot "ignore undisputed evidence contrary to the finding," but must otherwise look at the evidence in the light most favorable to the judgment, which means we must "assume that the factfinder resolved disputed facts in favor of the finding," *id.* at 630-31, and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible," *In re J.F.C.*, 96 S.W.3d at 266. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the finding and considering undisputed contrary evidence, a reasonable factfinder could have formed a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d at 631; *In re J.F.C.*, 96 S.W.3d at 266.

A factual-sufficiency review, in contrast, requires "weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d at 631. The reviewing court must consider "whether disputed evidence is such that a reasonable

3

factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

In our review of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of the witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

## DISCUSSION

### *Predicate Statutory Findings*

In four issues on appeal, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings as to each statutory ground alleged by the Department and found by the trial court—namely, Subsections (D), (E), (O), and (P) of Section 161.001(b)(1). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P). We will begin our review by analyzing whether the evidence is sufficient to support the trial court's finding of endangerment under Subsection (E).

#### *Applicable Law*

A trial court may order termination of the parent-child relationship under subsection (E) if clear and convincing evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). When evaluating the evidence with respect to Subsection (E), the relevant inquiry is whether the child's physical or

4

emotional well-being was endangered as a direct result of the parent's conduct, including acts and omissions or failures to act. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797 at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 711 (Tex. App.—El Paso 2012, no pet.). "Termination under subsection (E) requires more than a single act or omission, and the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent, considering a parent's actions both before and after the child was removed from the home." *T.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00174-CV, 2021 WL 4692471 at *6 (Tex. App.—Austin Oct. 8, 2021, pet. denied) (mem. op.). Further, in evaluating whether the evidence supports a finding of endangerment under Subsection (E), the factfinder may consider conduct that occurred both before and after the child was born. *M.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00531-CV, 2021 WL 1704258 at *6 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.) (citing *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

A child is "endangered" if the child is exposed to loss or injury or if the child's emotional or physical health is jeopardized. *D.H. v. Texas Dep't of Family & Protective Servs.*, 652 S.W.3d 54, 61 (Tex. App.—Austin 2021, no pet.); *A.S.*, 394 S.W.3d at 711. Although endangerment means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), it is not necessary to show that the conduct was directed at the child or that the child actually suffered injury, *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Moreover, endangerment does not have to be established as an independent proposition but may instead be inferred from the parental misconduct alone. *A.C. v. Texas Dep't*

5

*of Family & Protective Servs*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet denied) (citing *Boyd*, 727 S.W.2d at 533). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re J.O.A.*, 283 S.W.3d at 336.

### Evidence Presented

At trial, the State presented the testimony of Amber Mossette, the Department investigator assigned to the case; Tatila Shaw, the Department conservatorship caseworker; Mother; Greg Cougar, a licensed professional counselor who provided counseling services to Mother during the case; and Lisa Morita, the Court Appointed Special Advocate (CASA) volunteer.

In her testimony, Mossette stated that the case began after the Department received "an intake about [M]other's drug use and the child being dirty." As to the allegation that E.Y. was "dirty," Mossette testified that during her investigation, she discovered that E.Y. had lice and that "diaper changes weren't being done correctly." Mossette also observed that "[t]he house wasn't set up for a child," and that Mother and E.Y. were "staying in the living room area" of a friend, and there was "really nowhere for [E.Y.] to stay." As to the report of drug use, Mossette testified that on April 13, 2021, following a drug test, Mother signed an "acknowledgement of substance abuse." In that document, which was admitted into evidence at trial, Mother acknowledged that she had tested positive for and admitted to the use of methamphetamine and marijuana. Finally, Mossette testified that during her investigation she learned that Mother previously had another child removed from her care by the Department due

6

to "physical abuse." Mossette did not provide details as to what led the Department to conclude that physical abuse had occurred with the other child or who had committed the abuse.

Caseworker Shaw testified as to Mother's compliance with the requirements of her court-ordered service plan. Shaw testified that Mother was required, in part, to submit to random drug tests; undergo a psychological evaluation and a screening for alcohol and substance abuse, known as an Outreach Screening Assessment Referral (OSAR); and attend individual therapy. In addition, Mother was required to follow any recommendations made as a result of her psychological evaluation and OSAR.

According to Shaw's testimony, Mother failed to complete several of her service-plan requirements. Although Mother submitted to random drug tests, as required, the results of those tests showed that Mother tested positive for marijuana on November 8, 2021; January 4, 2022; January 28, 2022; March 4, 2022; March 31, 2022; April 12, 2022; and April 26, 2022. In addition, although Mother completed her OSAR in February 2022, she did not participate in "intensive outpatient drug treatment," as recommended by her OSAR. Similarly, she did not attend Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings as recommended in her psychological evaluation. Mother received some individual mental-health therapy but did not start her sessions until September 2022, more than a year after the case began and approximately a month before trial. Finally, Shaw testified that Mother had moved four times since the case began and that the Department was concerned about Mother's inability to maintain stable employment and housing. The Department did not consider her current home to be a safe environment due in part to the ongoing illegal drug use in the home.

During her testimony, Mother explained that her understanding was that E.Y. was removed from her care because her "father called and was saying I didn't have her in the proper

7

clothing when I left." She denied that she was using methamphetamine at the time of removal but admitted that she used it "shortly after." According to Mother's testimony, the only illegal drug that she was using regularly at the time of trial was marijuana. Although she was trying to stop using marijuana, she was not attending NA or AA meetings because she "ha[sn't] been able to find any." Mother testified that she called a provider to set up an OSAR evaluation, as required by her service plan, but was told they could not provide services because she was not actively using drugs at that time. At the time of trial, Mother had not received any drug-treatment counseling. Mother testified that she completed her court-ordered parenting classes, but when questioned about what she had learned in her parenting classes, she explained, "I didn't need to learn anything because I already knew what to do. It's just, you know, the drugs are what caused me to not be able to properly care for [E.Y.]" Mother also testified that approximately a month before trial she began receiving individual therapy to treat depression and anxiety, for which she takes medication, and that she thought the counseling sessions were going well.

As to her living arrangements, Mother testified that at the time of removal, she was living with her father but that she left after a month because they were "constantly fighting." Mother explained that she was raised by her mother, who died soon after E.Y.'s birth, and that she did not have a relationship with her father until after her mother's death. Mother is currently living with her boyfriend, who uses marijuana to "treat his seizures." Also living in the house with Mother and her boyfriend are her boyfriend's brother, cousin, sister, and sister's boyfriend. Because Mother is currently unemployed and has not worked in three months, her boyfriend pays her portion of the rent, $245 per month.

Cougar, the counselor who provided individual therapy to Mother, testified about his professional assessment of Mother. Cougar testified that he conducted five therapy sessions with Mother and that, based on his observations, she has not yet "develop[ed] tools to manage impulses to use drugs [and] stabilize her life." According to Cougar, Mother reported to him that she has not used methamphetamine in "quite a while" but continues to smoke marijuana, as recently as the week before trial. In his opinion, Mother surrounds "herself with anti-social people that utilize poor judgment and decision-making to handle stress."

Finally, Morita testified that CASA recommended that the trial court terminate Mother's rights so that E.Y. could be placed in a "safe and stable" home, with parents who could meet her psychological and medical needs. Morita stated that she had observed visits between Mother and E.Y. and that during these visits Mother played with E.Y. and brought her snacks and clothing. Nevertheless, Morita stated that she believed termination of Mother's parent rights was in E.Y.'s best interest and that CASA's main concerns were Mother's lack of stable housing, her inconsistent visits with E.Y., and "her lack of concern with [E.Y.'s] medical condition."

*Analysis*

On appeal, Mother asserts that the evidence is insufficient to support a finding of endangerment because there is no evidence that her drug use, the only potentially endangering conduct at issue, "affected her life or her parental abilities or endangered the child." Specifically, Mother argues that there is no evidence as to the "frequency or amount of her methamphetamine use" or that she used marijuana "when in possession of the child." In addition, Mother points out, the undisputed evidence shows that she remained clean of methamphetamine after E.Y. was removed from her care.

9

On this record, the evidence concerning Mother's drug use is sufficient to support a finding of endangerment under Subsection (E).

Although not automatic, a parent's illegal drug use may qualify as an endangering course of conduct under Subsection (E) "because it exposes the child to the possibility that the parent may be impaired or imprisoned." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *A.C.*, 577 S.W.3d at 699. Endangerment does not have to be established as an independent proposition but may instead be inferred from parental misconduct. *D.H.*, 652 S.W.3d at 61 (citing *Boyd*, 727 S.W.2d 533). "In some circumstances, a parent's drug use might be so pervasive or serious that the factfinder could reasonably infer that the drug use is endangering, despite a lack of evidence showing that the drug use caused some other endangering activity or even that the drug use occurred while the children were in the parent's direct care." *See D.H.*, 652 S.W.3d at 61; *In re M.A.J.*, 612 S.W.3d 398, 407-08 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (concluding that evidence of positive drugs tests after Department received referral that parent used narcotics was sufficient to support finding of endangerment under subsection (E)).

Here, the undisputed evidence establishes that Mother used methamphetamine in the past and that, based on her positive test in April 2021, she used methamphetamine the month before E.Y. was removed from her care. Although there was no direct evidence presented as to the length or frequency of Mother's methamphetamine use, the evidence shows that when the Department began its investigation, Mother lacked appropriate living arrangements for E.Y. and some of the child's basic needs had been neglected. By Mother's own admission, her drug use prior to E.Y.'s removal prevented her from "properly car[ing] for E.Y." From these circumstances, the trial court could have reasonably inferred that Mother's methamphetamine use in April 2021 was not an isolated event but was instead an ongoing course of conduct.

10

In addition, the evidence establishes that Mother used marijuana before E.Y. was removed from her care and that, even after the removal, when Mother was at risk of losing her parental rights, she continued to use marijuana regularly. *See D.H.*, 652 S.W.3d at 62 (collecting authorities and noting that courts of appeals have recognized "that a parent's decision to use illegal drugs while the termination suit is pending, and while the parent is at risk of losing her child, may support a finding of endangerment under subsection (E)"); *see also In re K.A.C.*, 594 S.W.3d 364, 373 (Tex. App.—El Paso 2019, no pet.) (evidence that parent continued to use illegal drugs when she knew parental rights were in jeopardy "is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being"). Consequently, Mother's continued use of marijuana while E.Y. was in the Department's care can, under these circumstances, be considered as evidence of endangerment. In addition, Mother failed to seek treatment for her substance-abuse issues, despite being required to do so by her service plan. In short, despite a lack of direct evidence that Mother's drug use caused some other independent endangering activity, the trial court could have reasonably inferred that Mother's illegal drug use jeopardized E.Y.'s emotional or physical well-being.

After considering all the evidence in the light most favorable to the trial court's finding, along with any undisputed evidence contrary to the finding under Subsection (E), we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in a course of conduct that endangered E.Y.'s physical or emotional well-being. *See* Tex. Fam. Code § 161.001(E); *In re A.C.*, 560 S.W.3d at 631. In addition, in view of the entire record, we conclude that the disputed evidence is not so significant that the trial court, as fact finder, could not have formed a firm belief or conviction that Mother engaged in conduct endangering to her child. *See In re A.C.*, 560 S.W.3d at 631. As a result, the evidence is legally

and factually sufficient to support the trial court's finding that termination of Mother's parental rights was warranted under Subsection (E).  We overrule Mother's second issue.

Because Section 161.001 requires proof of only one statutory predicate ground to support termination, we need not consider issues one, three, and four, in which Mother asserts that the evidence is insufficient to support termination under Subsections (D), (O), and (P).[3]  *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) ("To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground."); *see also* Tex. R. App. P. 47.1.

### *Best-Interest Finding*

We next consider Mother's argument that the evidence is legally and factually insufficient to support the trial court's best-interest finding.  *See* Tex. Fam. Code § 161.001(b)(2).

---

[3]  The Texas Supreme Court has held that due process requires an appellate court to review challenged endangerment findings under Subsection (D) or (E), even if termination could be upheld on another statutory predicate finding, because of collateral consequences that the finding could have in any future proceeding brought under Subsection (M).  *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019); *see* Tex. Fam. Code § 161.001(b)(1)(M) (providing that parental rights may be terminated if clear and convincing evidence shows that parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)").  This Court has subsequently held, however, that an appellate court may uphold one endangerment finding under Subsection (D) or (E), without addressing the other, even in cases where both findings are challenged on appeal. *J.B.M.H. v. Texas Dep't of Family & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315 at *8 (Tex. App.—Austin Apr. 13, 2023, no pet. h.) (mem. op.) (affirming endangerment finding under Subsection (D) without addressing challenge to finding under subsection (E) because "collateral consequences [under future Subsection (M) termination] are identical" whether based on finding under Subsection (D), (E), or both); *but cf. J. B. M. H.*, 2023 WL 2920315, at *12-14 (Theofanis, J., concurring).

12

*Applicable Law*

A determination of whether termination is in the best interest of a child is "child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d at 631. A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship, *see In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied), although "[t]he strong presumption that a child's best interest is served by keeping the child with his or her biological parents disappears when confronted with evidence to the contrary," *Aguilar v. Foy*, No. 03-10-00678-CV, 2012 WL 677497, at *8 (Tex. App.—Austin Mar. 1, 2012, no pet.) (mem. op.).

To determine whether termination is in a child's best interest we consider the non-exhaustive factors set out in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976), including (1) the desires of the child; (2) the child's present and future emotional and physical needs; (3) any emotional and physical danger to the child, now and in the future; (4) the parenting abilities of the person seeking custody; (5) the programs available to assist these individuals in promoting the best interest of the child; (6) the plans for the child by the individual or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. The Department is not required to prove all of these factors, and the absence of evidence of some of these factors would not preclude a finding that termination is in the child's best interest, "particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

While proof concerning the statutory predicates under Section 161.001(b)(1) does not relieve the Department of having to prove that termination is in the best interest of the children, the "same evidence may be probative of both issues." *V.P.*, 2020 WL 544797 at *8. "When considering the child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment*." In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *Id.*

*Analysis*

As previously discussed, the Department presented evidence concerning Mother's drug use, both prior to and after E.Y.'s removal, along with evidence showing that she failed to seek treatment for her drug use. The trial court could have reasonably inferred from this evidence that if E.Y. were returned to Mother's care, her marijuana use would continue and her methamphetamine use would recur. *See S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796 at *16 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.) (explaining that evidence of illegal drug use supports finding that termination is in child's best interest and that "factfinder may give great weight to this significant factor"); *In re T.N.J.J.*, No. 04-19-00228-CV, 2019 WL 6333470 at *5 (Tex. App.—San Antonio Nov. 27, 2019, no pet.) (mem. op) (explaining that evidence of drug use is especially relevant in accessing parenting abilities and whether existing parent-child relationship is not appropriate).

The Department also presented evidence that E.Y. has specialized medical needs. Mother testified that E.Y. has a heart condition for which E.Y. takes medication. Mother did not

know the name of the medication, and she stated that she had not spoken with E.Y.'s current doctor. Nevertheless, Mother testified that she would provide for E.Y.'s medical needs by taking her to the doctor for treatment. According to caseworker Shaw's testimony, E.Y.'s condition is "ventricular septal defect," which "means [there is] a tiny hole in the wall between the four chambers of her heart," and E.Y. is under the care of a cardiologist for her heart condition, a sleep psychologist for a sleep disorder, and an ophthalmologist for her crossed eyes. E.Y. also recently completed occupational therapy and physical therapy.

As to Mother's parenting abilities, counselor Cougar testified that, based on his professional evaluation, "there's a huge deficit in [Mother's] ability to manage stress and just kind of coping with life" and that "it seems like such an easy outlet for her to use marijuana." In short, Cougar testified that he was "most concerned about the instability in [Mother's] life" and that she had not made much progress in therapy. From Cougar's testimony, along with the evidence concerning Mother's drug use, the circumstances surrounding E.Y.'s removal, and E.Y.'s medical needs, the trial court could have reasonably inferred that Mother would be unable to care for E.Y.'s physical needs and that returning E.Y. to her Mother's care would pose an unacceptable risk to the child's physical and emotional well-being.

The trial court also heard about Mother's relationship with E.Y. and her plans for their future. Mother testified that during their visits they play on the playground and do activities and that she often reads to E.Y. As to Mother's future plans, Mother stated, "I would work on getting my own place, but [E.Y.] would have her own room," and testified that she and her boyfriend would "save up the money to get it." Mother also acknowledged, however, that it was unsafe for E.Y. to be around people who smoke marijuana and that she was not sure where she and E.Y. would live if they did not live with her boyfriend, who smokes marijuana. Mother also

15

testified that she is currently unemployed and recently quit her job at a hotel after only a few days because she got sick and was told not to come back. Before that, Mother worked at a gas station for a couple of months but quit that job because she was "being bullied." The trial court could have reasonably inferred from the evidence that Mother would be unable to provide E.Y. with a safe and stable home environment.

Finally, the trial court heard testimony about the Department's plan for placement of E.Y. and the care that she has received while living with her foster parents. While parental rights may not be terminated merely because a child might be better off living somewhere else, a factfinder may consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than an impermanent foster-care arrangement that could result if termination were not ordered. *V.P.*, 2020 WL 544797 at *9.

Caseworker Shaw testified that E.Y. has been residing with her foster parents since removal and that the foster parents plan to adopt E.Y. if parental rights are terminated. Shaw described the relationship between E.Y. and her foster parents as "very loving" and explained that E.Y. has bonded with her foster parents and is comfortable expressing her feelings to them. In addition, the foster parents have attended to E.Y.'s medical needs, taking her to all necessary medical appointments. In Shaw's view, E.Y. is thriving.

Reviewing the evidence under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that it was in E.Y.'s best interest to terminate Mother's parental rights. We overrule Mother's third appellate issue.

16

**CONCLUSION**

Having overruled Mother's issues on appeal, we affirm the trial court's order of termination.

_____

J. Woodfin Jones, Justice

Before Justices Baker, Smith, and Jones[*]

Affirmed

Filed:   May 31, 2023

[*]Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).

17